# Western Railway of Alabama v. Mutch, Adm'r.

*Action for Damages Causing Death.*

1. *Causal connection must exist between negligence and injury.*—The rate of speed of a train moving faster than was prescribed by an ordinance of a city, is not the proximate cause of an injury to a trespasser who is injured in the attempt to get on board such moving train within the limits of the city.

2. *A new trial should be granted,* when the verdict of the jury is palpably opposed to the evidence.

APPEAL from Lee Circuit Court.

Tried before Hon. J. M. CARMICHAEL.

This was an action by the administrator of James T. Mutch, deceased, for damages for negligently killing his intestate. The only negligence shown was that the train at the time of the injury was moving at a rate of speed estimated by some of the witnesses to be from six to eight miles an hour, and an ordinance of the City of Opelika prohibiting trains being moved at a greater rate of speed than four miles an hour.

The defendant excepted to six charges given at the request of plaintiff, and requested eighteen charges which were refused by the court, among which was the general affirmative charge in favor of the defendant, and other charges asserting that there was no causal connection between the rate of speed of the train and the injury.

There was a verdict for plaintiff for $5,000, and a motion for a new trial, one of the grounds for which was, that the verdict was opposed to the evidence.

GEO. P. HARRISON, and R. F. LIGON, JR., for appellant, insisted that the rate of speed of the train was not the proximate cause of the injury, citing *N. C. & St. L. R. R. v. Hembree,* 85 Ala. 481; Sherman & Redfield on Neg. § 49; 4 Am. & Eng. Encyc. pp. 46, 47, 53; *Penn. R. R. v. McMullen,* 41

Am. & Eng. R. R. Cas. 505; that the general charge should have been given: *C. & W. Rw'y. Co. v. Bradford*, 86 Ala. 574; *Pleiffer v. Ringley*, 12 Daly, 106; *Wright v. Rawson*, 52 Iowa, 329; *C. R. R. v. Letcher*, 69 Ala. 106; *M. & C. R. R. v. Copeland*, 61 Ala. 376; *R. R. Co. v. Houston*, 95 U. S. 696, and numerous other authorities.

A. & R. B. BARNES, W. J. SAMFORD and J. M. CHILTON, for appellee, cited *Gov't. St. Rw'y. v. Hanlon*, 53 Ala. 77; *Kay v. Penn. R. R.* 65 Pa. 269; *M. & M. R. R. v. Crenshaw*, 65 Ala. 566; *Bay Shore R. R. v. Harris*, 67 Ala. 8; *R. R. Co. v. Stout*, 17 Wall. 660; *R. R. Co. v. Gadman*, 15 Wal. 408.

STONE, C. J.—The plaintiff, George Mutch, was a resident of Opelika. His son, James Mutch, was nine and a half years old, well grown and developed for his age, and, in intelligence and brightness, was above the average of boys of his age. He went at large without being attended by a nurse or protector, and was attending school.

The Western Railway of Alabama runs through Opelika, and has a station and depot in that city or town. There was an ordinance of force in Opelika which made it unlawful to run a train of cars within the corporate limits at a higher rate of speed than four miles an hour, and imposing a penalty for its violation. A freight-train of the railroad was coming into Opelika on an afternoon in March, 1889. It had box-cars, and attached to the side of one of them was a ladder, placed there to enable brakemen to reach the top of the car. The little boy, James, having placed himself at the side of the track, attempted to seize the ladder as it passed him, that he might climb up on it, and thus enjoy a ride. He did succeed in catching a round of the ladder, but in attempting to ascend he missed his footing, fell under the train, and was so injured and crushed that he died of the wounds. Up to this point there is no conflict, or uncertainty in the testimony.

The present suit was brought against the railroad, and seeks to recover damages from it for this alleged negligent killing of plaintiff's intestate. The negligence charged—and there is no other pretended, or attempted to be shown—is, that the train was being moved at a greater rate of speed than four miles an hour. Some of plaintiff's witnesses testified that it was moving at the rate of six or seven miles an hour. On the other hand defendant's witnesses placed the speed, some as low as three, and none above four miles an hour. This was not the first time intestate had attempted

to spring on moving trains, and he had been more than once cautioned against such attempts.

Assuming that the speed of the train was in excess of four miles an hour, was there a causal connection between such breach of duty on the part of the railroad company and the injury done to plaintiff's intestate?

Persons who perpetrate torts are, as a rule, responsible, and only responsible for the proximate consequences of the wrongs they commit. In other words, unless the tort be the proximate cause of the injury complained of, there is no legal accountability. In that able and valuable work, . Amer. & Eng. Encyc. of Law, Vol. 16, 436, is this language: "A proximate cause may be defined as that cause which is a natural and continuous sequence, unbroken by any efficient, intervening cause, producing the result complained of, and without which that result would not have occurred. And it is laid down in many cases, and by leading text-writers, that in order to warrant a finding, that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it was such as might or ought to have been foreseen in the light of the attending circumstances." On page 431 of the same volume it is said: "To constitute actionable negligence, there must be not only causal connection between the negligence complained of and the injury suffered, but the connection must be by a *natural and unbroken sequence*—without intervening, efficient causes—so that but for the negligence of the defendant the injury would not have occurred; it must not only be *a* cause, but it must be *the proximate;* that is, the direct and immediate, efficient cause of the injury."

That philosophic law-writer, Dr. Wharton, Law of Negligence § 75, expresses the principle as follows: "If the consequence flows from any particular negligence, according to ordinary natural sequence, without the intervention of any human agency, then such sequence, whether foreseen as probable, or unforeseen, is imputable to the negligence." Quoting from Ch. B. Pollock with apparent approval, he in § 78 says, "I entertain considerable doubt whether a person who has been guilty of negligence is responsible for all the consequences which may under any circumstances arise, and in respect of mischief which could by no possibility have been foreseen, and which no reasonable person would have anticipated. I am inclined to consider the rule of law to be this: that a person is expected to anticipate and guard

[Western Railway of Alabama v. Mutch, Adm'r.]

against all reasonable consequences, but that he is not by the law of England expected to anticipate and guard against that which no reasonable man would expect to occur." In the same section he quotes approvingly the following language from Lord Campbell: "If the wrong and the legal damage are not known by common experience to be usually in sequence, and the damage does not according to the ordinary course of events, follow from the wrong, the wrong and the damage are not sufficiently conjoined or concatenated, as cause and effect, to support an action."

In Shearman & Redfield, Law of Negligence, § 26, the principle is thus stated: "The proximate cause of an event must be understood to be that which, in a natural and continuous sequence, unbroken by any new cause, produces that event, and without which that event would not have occurred."

The authorities from which we have quoted are everywhere regarded as standard. What they assert is but the condensation of the utterances of a very great number of the highest judicial tribunals, wherever the principles of the common-law prevail. See 16 Amer. & Eng. Encyc. of Law, 428–9; *Milw. & St. Paul Rwy. Co. v. Kellogg*, 94 U. S. 469; *Herring v. Skaggs*, 62 Ala. 180; *Daughtry v. Am. U. Tel. Co.* 75 Ala. 168.

*Lynch v. Murdin*, 1 Q. B. Rep. N. S. 29—s. c. 41 Eng. Com. Law Rep. 422—is the strongest of the cases relied on in support of the present action. The injury in that case occurred in a city. The head-note contains a summation of the facts as follows: "Defendant (a cartman) negligently left his horse and cart unattended in the street. Plaintiff, a child seven years old, got upon the cart in play; another child incautiously led the horse on; and plaintiff was thereby thrown down and hurt." It was held that the action was maintainable for the recovery of damages, "and that it was properly left to the jury, whether defendant's conduct was negligent, and the negligence caused the injury." In delivering his opinion Lord Denman used the following language: "If I am guilty of negligence in leaving anything dangerous in a place where I know it to be extremely probable that some other person will unjustifiably set it in motion to the injury of a third, and if that injury should be so brought about, I presume that the sufferer might have redress by action against both, or either of the two, but unquestionably against the first. · · · Can the plaintiff then, consistently with the authorities, maintain his action, having been at least equally in fault? The answer is, that suppos-

ing that fact ascertained by the jury, but to this extent, that he merely indulged the natural instinct of a child, in amusing himself with the empty cart and deserted horse, then we think that the defendant can not be permitted to avail himself of that fact. The most blamable carelessness of his servant having tempted the child, he ought not to reproach the child with yielding to that temptation."

Reading the case of *Lynch v. Murdin* in the light shed upon it by Lord Denman's reasoning, no one can fail to note the marked difference between that case and the one we have in hand. The argument by which the learned Lord Chief Justice supported the judgment he announced, has no application to the present one. That case was manifestly decided on the well recognized principle, that if one leave dangerous machinery, or any other thing of similar nature, unattended in an exposed place, and another be injured thereby, an action on the case may be maintained for such injury, unless plaintiff was guilty of contributory negligence. *Clark v. Chambers*, 3 Q. B. Div. 327; *Kunz v. City of Troy*, 10 N. E. Rep. 442; *R. R. Co. v. Stout*, 2 Dillon 294; Beach on Con. Negligence §§ 140, 206. Infants of tender years, and wanting in discretion, are not amenable to the disabling effects of contributory negligence. In the opinion of the court in the case of *Lynch v. Murdin*, the causal connection between the negligence and the injury was so direct and patent, that the driver, exercising ordinary care and prudence, should have anticipated and guarded against it. The implication from Lord Denman's language is very strong that he regarded the cartman's conduct as grossly negligent. Contributory negligence is no defense to injuries which result from gross negligence. But, the principle declared in *Lynch v. Murdin* was, if not materially shaken, at least shown to be inapplicable to a case like the present one, in the two later English cases of *Hughes v. Maefie*, 2 Hurls. & Colt. 744 and *Mangan v. Atterton*, L. R. 1 Exch. 239. See also *McAlpin v. Powell*, 70 N. Y. 126; *Wendell v. N. Y. Cen. & H. R. R. R. Co.*, 91 N. Y. 420; *St. L., V. & T. H. R. R. Co. v. Bell*, 81 Ill. 76.

The case of *Messenger v. Dennie*, 137 Mass. 197, is a strong authority against the right to maintain the present action.

Another case relied on in support of the present action is *Railroad Company v. Gladden*, 15 Wal. 401. That case is wholly unlike the present one, and rests on a different principle. The negligence of defendant's agent was manifest, and the injury was the natural consequence of the negligence. Had the driver been looking ahead as he should

have been, he would have seen the child's danger, and could and would have stopped his car, before his horses did the injury. The causal connection in that case was complete, because the injury resulted so naturally from the driver's inattention, that the law regards it as the probable consequence of his negligence. None of the cases cited support the contention of appellee.

The ordinance of Opelika, restricting the speed of trains within the corporate limits to four miles an hour, had one purpose, one policy. Opelika is a town probably of four or more thousand inhabitants. The railroad ante-dated the town, and caused its location there. It runs centrally through the business portions of the place. In such conditions men pursuing business avocations, as well as idlers and curiosity seekers, will congregate about the depot and track of the railroad, and will be constantly crossing, if not standing on the track. They do both. Knowing this habit of men, most towns located on railroads have ordinances requiring trains passing through them to move at a low rate of speed. Why? Not because they apprehend that reckless persons will attempt to board the train while in motion. The wildest conjecture would scarcely take in an adventure so fraught with peril. The policy was to enable persons who might be standing on the track, or whose business pursuits required them to be crossing it, to get off the track, and thus escape the danger of a collision. The ordinance had no other aim.

We hold as matter of law that there was no proof whatever in this case, tending to show a causal connection between the negligence charged, and the injury suffered. To illustrate our views: Let us suppose that the negligence charged against the railroad company had been, not the too rapid movement of the train, but some imperfection, decay, or derangement of the ascending ladder, which caused plaintiff's intestate to fall and lose his life. Would any one contend the railroad company would be liable for such accident? And is there a difference in principle between the case supposed, and the one we have in hand? Charge No. 21—the general charge in favor of the defendant—ought to have been given.

The great English commentator said "Law is the perfection of human reason." This, in a sense, is true. It is the expression of the combined wisdom of the legislative body. It is the creature, however, of human thought, and nothing human is perfect. Nor is it true that legislative policy is unchanging. Conditions change, and the law which should

adapt itself to human wants, must change with them. Still, while the law stands on the statute book, it should be obeyed and conformed to as a rule of action. If we cut loose from its restraints, we expose ourselves to the tempests of human passion and human prejudice, and like a ship at sea without rudder or compass, will surely be dashed on some of the many shoals which are found all along the voyage of life.

Trial by jury is a bulwark of American, as it has long been of English freedom. It wisely divides the responsibility of determinative adjudication, of punitive administration, between the judge, trained in the wisdom and intricacies of the law, and twelve men chosen from the common walks of non-professional life; chosen for their sound judgment and stern impartiality. The one declares the rules of law applicable to the issue or issues formed, in the light of testimony adduced; the other weighs the testimony, determines what facts it proves, and, moulded by the law as declared by the court, renders its verdict.

In the jury box, and under the oath the jurors have solemnly sworn on the holy evangelists of Almighty God, there is no room for friendship, partiality, or prejudice; no permissible discrimination between friends and enemies, between the rich and the poor, between corporations and natural persons. The ancients painted the goddess of justice as blind-folded, and jurors must be blind to the personal consequences of the verdicts they render. If the testimony convinces their judgments of the existence of certain facts, they must be blind to the consequences which result from those facts. A wish that it were otherwise furnishes no excuse for deciding against their convictions. Justice thus administered commands the approbation of heaven and earth alike; and a verdict thus rendered meets all the requirements of the juror's oath, in the fullest sense of the word—a true expression of the convictions fixed on the minds of the jury by the testimony.

Independent of the legal question considered above, and which we have declared to be determinative of this case, the verdict of the jury was so palpably against the evidence that a new trial ought to have been granted on that account.

Reversed and remanded.